Filed 6/21/12

# IN THE SUPREME COURT OF CALIFORNIA

ALLAN PARKS, )
)
    Plaintiff and Appellant, )
) S183703
    v. )
) Ct.App. 4/3 G040798
MBNA AMERICA BANK, N.A., )
) Orange County
    Defendant and Respondent. ) Super. Ct. No. 04CC00598
_____ )

       We granted review to address whether the National Bank Act of 1864 (13 Stat. 99) (NBA) preempts Civil Code section 1748.9, a California law requiring that certain disclosures accompany preprinted checks that a credit card issuer provides to its cardholders for use as credit. The NBA contains no such requirement with respect to the issuance of so-called "convenience checks" to credit customers. Instead, it broadly grants to national banks "all such incidental power as shall be necessary to carry on the business of banking . . . by [among other powers] loaning money on personal security." (12 U.S.C. § 24, par. Seventh.) We conclude that the NBA preempts Civil Code section 1748.9 because the state law stands as an obstacle to the broad grant of power given by the NBA to national banks to conduct the business of banking. Accordingly, we reverse the Court of Appeal's judgment and remand the matter to that court for further proceedings consistent with our opinion.

## I.

       As indicated in the Court of Appeal's opinion below, defendant MBNA America Bank, N.A. (MBNA) "renamed itself as FIA Card Services, N.A. Nevertheless, for the

1

sake of simplicity, we shall follow the parties in continuing to refer to defendant as MBNA."

In 2003, MBNA issued a credit card to plaintiff Allan Parks. Later that year, as part of its service to cardholders, MBNA extended credit to plaintiff by sending him preprinted drafts, commonly referred to as "convenience checks." (See *Rose v. Chase Bank USA, N.A.* (9th Cir. 2008) 513 F.3d 1032, 1034 (*Rose*).) Plaintiff used several of these convenience checks to purchase holiday gifts and pay bills, and he incurred finance charges in excess of those he would have incurred had he used his credit card for similar transactions. The convenience checks that MBNA sent to Parks did not include disclosures required by Civil Code section 1748.9. That statute says: "A credit card issuer that extends credit to a cardholder through the use of a preprinted check or draft shall disclose on the front of an attachment that is affixed by perforation or other means to the preprinted check or draft, in clear and conspicuous language, all of the following information: (1) That 'use of the attached check or draft will constitute a charge against your credit account.' (2) The annual percentage rate and the calculation of finance charges, as required by Section 226.16 of Regulation Z of the Code of Federal Regulations, associated with the use of the attached check or draft. (3) Whether the finance charges are triggered immediately upon the use of the check or draft." (Civ. Code, § 1748.9, subd. (a) (paragraphing omitted) (hereafter section 1748.9).)

In 2004, plaintiff sued MBNA on behalf of himself and similarly situated MBNA customers, alleging that the bank engaged in unfair competition in violation of Business and Professions Code section 17200 et seq. by failing to make the disclosures mandated by section 1748.9. Plaintiff sought both monetary and injunctive relief. MBNA took the position that the NBA and a now-superseded federal regulation, title 12 Code of Federal Regulations part 7.4008(d) (2004) (hereafter former regulation 7.4008(d)), preempt the state disclosure law. (Former regulation 7.4008(d) was superseded by a 2010 amendment to 12 C.F.R. section 7.4008 promulgated after Congress enacted the Dodd-Frank Wall

2

Street Reform and Consumer Protection Act (Pub. L. No. 111-203 (July 21, 2010) 124 Stat. 1376) (hereafter Dodd-Frank Act).) After several years of litigation, MBNA renewed a previously rejected motion for judgment on the pleadings in light of the 2008 decision by the United States Court of Appeals for the Ninth Circuit in *Rose*, which involved different parties but the same factual and legal issues presented here. The Ninth Circuit concluded that the NBA and former regulation 7.4008(d) preempt section 1748.9, and it affirmed the district court's conclusion that the bank's failure to attach the statutorily mandated disclosures to its convenience checks was not unlawful. (*Rose*, *supra*, 513 F.3d at p. 1038.) Relying on *Rose*, the trial court granted MBNA's renewed motion.

The Court of Appeal reversed. Applying *Barnett Bank of Marion County, N.A. v. Nelson* (1996) 517 U.S. 25 (*Barnett Bank*), the Court of Appeal concluded that the NBA does not preempt section 1748.9 because the state law does not "significantly impair" the power of national banks. According to the Court of Appeal, section 1748.9 is a "generally applicable disclosure law" that does not forbid banks from making loans via convenience checks. It "merely requires 'clear and conspicuous' disclosures of three items of information and requires those disclosures to be attached to the convenience checks." The Court of Appeal acknowledged that section 1748.9 "imposes *some* burden" on national banks and that finding preemption would "establish clarity in the law." But the court said its task was "not to divine the best policy," and it went on to hold that "when a state disclosure requirement does not, on its face, forbid or significantly impair national banks from exercising a power granted to it by Congress under the NBA, national banks claiming preemption must make a factual showing that the disclosure requirement significantly impairs the exercise of the relevant power or powers." The court concluded that "[s]ection 1748.9 does not, on its face, significantly impair federally authorized powers under the NBA" and that "given the procedural posture of this case,

3

MBNA has not yet had an opportunity to submit evidence establishing a significant impairment."

The Court of Appeal further held that section 1748.9 was not preempted by former regulation 7.4008(d). That regulation provided, in pertinent part, that "state laws that obstruct, impair, or condition a national bank's ability to fully exercise . . . lending powers are not applicable to national banks. [¶] . . . A national bank may make non-real estate loans without regard to state law limitations concerning: [¶] . . . [¶] . . . Disclosure and advertising, including laws requiring specific statements, information, or other content to be included in credit application forms, credit solicitations, billing statements, credit contracts, or other credit-related documents." (12 C.F.R. § 7.4008(d)(1), (2)(viii) (2004).) The Court of Appeal held that "if valid, [former regulation 7.4008(d)] expressly preempts section 1748.9," and it further noted that the Office of the Comptroller of the Currency (OCC) had properly promulgated the regulation through the notice and comment procedure required for issuing a preemptive regulation under title 12 United States Code section 43(a).

The Court of Appeal concluded, however, that "[t]he language of [former regulation 7.4008(d)] does not suggest a reasonable attempt to describe and interpret the reach of NBA preemption. [Citation.] Rather, the regulation exempts national banks from all state disclosure requirements, even though . . . the NBA . . . [did not] express[] an intention to create this bright line exemption." Moreover, the Court of Appeal reasoned, Congress failed to "delegate[] the power to [the] OCC to take 'administrative action whose sole purpose [is] to preempt state law rather than to implement a statutory command.' (*Watters* [*v. Wachovia Bank, N.A.* (2007)] 550 U.S. [1,] 44 (dis. opn. of Stevens, J.).)" Though "reluctant to create a split of authority [sic] with the Ninth Circuit Court of Appeals on a point of federal law," the Court of Appeal said it was "require[d] . . . to do so."

We granted MBNA's petition for review.

4

## II.

A preemption "question is basically one of congressional intent. Did Congress, in enacting the Federal Statute, intend to exercise its constitutionally delegated authority to set aside the laws of a State? If so, the Supremacy Clause requires courts to follow federal, not state, law." (*Barnett Bank*, *supra*, 517 U.S. at p. 30, citing U.S. Const, art. VI, cl. 2; see also *Viva! Internat. Voice for Animals v. Adidas Promotional Retail Operations, Inc.* (2007) 41 Cal.4th 929, 935 (*Viva! International*).)

This court has recognized "four species of federal preemption: express, conflict, obstacle, and field." (*Viva! International*, *supra*, 41 Cal.4th at p. 935.) "First, express preemption arises when Congress 'define[s] explicitly the extent to which its enactments pre-empt state law. [Citation.] . . . .' [Citations.] Second, conflict preemption will be found when simultaneous compliance with both state and federal directives is impossible. [Citations.] Third, obstacle preemption arises when ' "under the circumstances of [a] particular case, [the challenged state law] stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." ' [Citations.] Finally, field preemption, i.e., 'Congress' intent to pre-empt all state law in a particular area,' applies 'where the scheme of federal regulation is sufficiently comprehensive to make reasonable the inference that Congress "left no room" for supplementary state regulation.' [Citation.]" (*Id*. at p. 936; accord, *Bronco Wine Co. v. Jolly* (2004) 33 Cal.4th 943, 955; see also *Barnett Bank*, *supra*, 517 U.S. at p. 31.) As explained below, the main dispute in this case implicates the third type of preemption — that is, whether section 1748.9 stands as an obstacle to the accomplishment and execution of the NBA's purposes.

## A.

"Since *McCulloch v. State of Maryland* [citation], it has not been open to question that the Federal Government may constitutionally create and govern [banks] within the states." (*Franklin Nat. Bank of Franklin Square v. New York* (1954) 347 U.S. 373, 375

5

(*Franklin*).)  In *Franklin*, the high court considered whether a New York statute prohibiting banks "from using the word 'saving' or 'savings' in their advertising or business" (*id.* at p. 374) was preempted by the Federal Reserve Act, which authorized national banks " 'to receive time and savings deposits' " (*Franklin*, at p. 375, quoting 12 U.S.C. § 371), or by the NBA, which grants national banks " 'all such incidental powers as shall be necessary to carry on the business of banking' " (*Franklin*, at p. 376, quoting 12 U.S.C. § 24, par. Seventh).  *Franklin* held that the state law was preempted, explaining that "[w]e cannot believe that the incidental powers granted to national banks should be construed so narrowly as to preclude the use of advertising in any branch of their authorized business." (*Franklin*, at p. 377.)  Because Congress had authorized national banks to "accept and pay interest on time deposits of people's savings, . . . they must be deemed to have the right to advertise that fact by using the commonly understood description which Congress has specifically selected.  We find no indication that Congress intended to make this phase of national banking subject to local restrictions, as it has done by express language in several other instances." (*Id.* at p. 378, fn. omitted.)

In subsequent cases involving national bank legislation, the high court has found preemption where compliance with federal and state law did not pose the kind of physical impossibility that exists where federal law *requires* banks to do something that state law *prohibits*.  Following *Franklin*, the high court has repeatedly found a sufficient basis for preemption where the federal banking statute provides "a broad, not a limited, permission." (*Barnett Bank*, *supra*, 517 U.S. at p. 32.)  In *Barnett Bank*, the court observed that the word "powers" is "a legal concept that, in the context of national bank legislation, has a history.  That history is one of interpreting grants of both enumerated and incidental 'powers' to national banks as grants of authority not normally limited by, but rather ordinarily pre-empting, contrary state law." (*Ibid.*)  The court went on to say that "where Congress has not expressly conditioned the grant of 'power' upon a grant of

6

state permission, the Court has ordinarily found that no such condition applies.  In *Franklin Nat. Bank*, the Court made this point explicit.  It held that Congress did not intend to subject national banks' power to local restrictions, because the federal power-granting statute there in question contained 'no indication that Congress [so] intended . . . as it has done *by express language* in several other instances.'  347 U.S. at 378, and n. 7." (*Barnett Bank*, *supra*, 517 U.S. at p. 34.)

*Barnett Bank* applied these principles to a Florida law providing that "banks cannot sell insurance in Florida — except that an *unaffiliated* small town bank (*i.e.,* a bank that is not affiliated with a bank holding company) may sell insurance in a small town."  (*Barnett Bank*, *supra*, 517 U.S. at p. 29.)  The federal law at issue said that " '*any*' " national bank operating in a small town " '*may . . . act as the agent for any fire, life, or other insurance company* authorized by the authorities of the State . . . to do business [there], . . . by soliciting and selling insurance. . . .' "  (*Id.* at p. 28, citing Act of Sept. 7, 1916, 39 Stats. 753, as amended, 12 U.S.C. § 92, alterations except final ellipsis in original.)  The court held the state law preempted, explaining that "[t]he Federal Statute before us, as in *Franklin Nat. Bank*, explicitly grants a national bank an authorization, permission, or power.  And, as in *Franklin Nat. Bank*, it contains no 'indication' that Congress intended to subject that power to local restriction."  (*Barnett Bank*, *supra*, 517 U.S. at pp. 34-35.)

In reaching this conclusion, the high court observed that a federal grant of power to national banks does not preempt state law where there is "an explicit statement that the exercise of that power is subject to state law" (*Barnett Bank*, *supra*, 517 U.S. at p. 34) or where the state law "does not prevent or significantly interfere with the national bank's exercise of its powers" (*id.* at p. 33).  Although "normally Congress would not want States to forbid, or to impair significantly, the exercise of a power that Congress explicitly granted," federal banking laws do not preempt state laws that do not significantly impair a national bank's exercise of its congressionally authorized powers.

7

(*Ibid.*)  In 2010, the Dodd-Frank Act codified the significant impairment test articulated in *Barnett Bank*.  (See 12 U.S.C. § 25b (b)(1)(B) [declaring state consumer financial laws preempted if "in accordance with the legal standard for preemption in the decision of the Supreme Court of the United States in [*Barnett Bank*] the State consumer financial law prevents or significantly interferes with the exercise by the national bank of its powers"].)

The high court affirmed and elaborated on these principles in *Watters v. Wachovia Bank, N.A.*, *supra*, 550 U.S. 1 (*Watters*).  There, the court considered Michigan statutes requiring "mortgage brokers, lenders, and servicers that are subsidiaries of national banks to register with the State's Office of Financial and Insurance Services . . . and submit to state supervision."  (*Id.* at p. 8, citing Mich. stats.)  It was undisputed that under the NBA "Michigan's licensing, registration, and inspection requirements cannot be applied to national banks" themselves.  (*Watters*, *supra*, 550 U.S. at p. 15; see *id.* at p. 13, quoting 12 U.S.C. § 484(a) [" 'No national bank shall be subject to any visitorial powers except as authorized by Federal law.' "].)  The question was whether Michigan's regulatory regime survived preemption as applied to operating subsidiaries of national banks.  The court held that it did not, relying on federal statutes and regulations authorizing operating subsidiaries to "engage only in activities national banks may engage in directly, 'subject to the same terms and conditions that govern the conduct of such activities by national banks.' "  (*Watters*, *supra*, 550 U.S. at p. 16, quoting Gramm-Leach-Bliley Act, § 121 (a)(2), 113 Stats. 1378, codified at 12 U.S.C. § 24a(g)(3)(A); see also *Watters*, *supra*, 550 U.S. at pp. 15-16, 20-21 [relying on OCC regulations].)  Except where federal law provides otherwise, the court explained, "we have treated operating subsidiaries as equivalent to national banks with respect to powers exercised under federal law" (*id.* at p. 18), including the NBA's grant of power "to engage in real estate lending" (*Watters*, *supra*, 550 U.S. at p. 7, citing 12 U.S.C. § 371) and " 'all such incidental powers as shall be necessary to carry on the business of banking' " (*Watters*, *supra*, 550 U.S. at p. 7,

8

quoting 12 U.S.C. § 24, par. Seventh). Because the Michigan statutes would interfere with the business of banking conducted by operating subsidiaries just as much as it would interfere with such business conducted by national banks themselves, the NBA preempted the state regulatory regime whether applied to national banks or to their operating subsidiaries. (*Watters*, *supra*, 550 U.S. at pp. 17-19.)

Summarizing the principles established in *Franklin* and *Barnett Bank*, the high court in *Watters* said: "In the years since the NBA's enactment, we have repeatedly made clear that federal control shields national banking from unduly burdensome and duplicative state regulation. [Citations.] . . . [¶] We have ' "interpret[ed] grants of both enumerated and incidental 'powers' to national banks as grants of authority not normally limited by, but rather ordinarily pre-empting, contrary state law." [Citations.] States are permitted to regulate the activities of national banks where doing so does not prevent or significantly interfere with the national bank's or the national bank regulator's exercise of its powers. But when state prescriptions significantly impair the exercise of authority, enumerated or incidental under the NBA, the State's regulations must give way.' " (*Watters*, *supra*, 550 U.S. at pp. 11-12.)

Moreover, in explaining why the Michigan supervisory regime could not apply to national banks and their operating subsidiaries, the high court in *Watters* said that were it otherwise, "[n]ational banks would be subject to registration, inspection, and enforcement regimes imposed not just by Michigan, but by all States in which the banks operate. Diverse and duplicative superintendence of national banks' engagement in the business of banking, we observed over a century ago, is precisely what the NBA was designed to prevent: 'Th[e] legislation has in view the erection of a system extending throughout the country, and independent, so far as powers conferred are concerned, of state legislation which, if permitted to be applicable, might impose limitations and restrictions as various and as numerous as the States.' [Citation.] Congress did not intend, we explained, 'to leave the field open for the States to attempt to promote the welfare and stability of

9

national banks by direct legislation. . . . [C]onfusion would necessarily result from control possessed and exercised by two independent authorities.' " (*Watters*, *supra*, 550 U.S. at pp. 13-14, fn. omitted; see also *id.* at pp. 17-18 ["[J]ust as duplicative state examination, supervision, and regulation would significantly burden mortgage lending when engaged in by national banks, so too would those state controls interfere with that same activity when engaged in by an operating subsidiary."].)

**B.**

Applying the principles above, we conclude that the NBA preempts section 1748.9. As noted, the NBA broadly authorizes national banks to exercise "all such incidental power as shall be necessary to carry on the business of banking." (12 U.S.C. § 24, par. Seventh.) This broad power expressly includes "loaning money on personal security." (*Ibid.*) The disclosure requirements in section 1748.9 impose a condition on the federally authorized power of national banks to loan money on personal security. Those requirements say that national banks like MBNA may offer credit in the form of convenience checks so long as the checks contain specific disclosures. But here, as in *Barnett Bank*, the federal statute does not grant national banks a "*limited* permission, that is, permission to [loan money on personal security] *to the extent that state law also grants permission to do so*." (*Barnett Bank*, *supra*, 517 U.S. at p. 31.) Instead, federal law authorizes national banks to loan money on personal security with "no 'indication' that Congress intended to subject that power to local restriction." (*Id.* at p. 35, quoting *Franklin*, *supra*, 347 U.S. at p. 378.)

The specific disclosure obligations imposed by section 1748.9 exceed any requirements in federal law. The requirement in section 1748.9 that disclosures appear "on the front of an attachment that is affixed by perforation or other means to the preprinted check or draft" has no counterpart in federal law. The same is true of section 1748.9's requirement that precise language ("use of the attached check or draft will constitute a charge against your credit account") appear on each check. (§ 1748.9, subd.

(a)(1).) In addition, although federal regulations require certain disclosures when the terms of using a convenience check differ from the terms of the customer's credit account (12 C.F.R. § 226.9(b)(1), (2)), they do not mandate that every convenience check disclose "[w]hether the finance charges are triggered immediately upon use of the check," as section 1748.9, subdivision (a)(3) requires. Furthermore, although section 1748.9, subdivision (a)(2) mandates disclosure of interest rates and finance charges "as required by Section 226.16 of Regulation Z of the Code of Federal Regulations," that federal regulation pertains to "advertising" (see 12 C.F.R. § 226.16) and arguably does not apply to convenience check offers.

In characterizing the disclosure requirements of section 1748.9, the Court of Appeal said that the statute "does not *forbid* the exercise of a banking power authorized by the NBA. Section 1748.9 does not bar national banks from loaning money on personal security through convenience checks." It is true that section 1748.9, unlike the state law in *Barnett Bank* that prohibited national banks from selling insurance in small towns, does not outlaw a category of banking activity. However, to say that MBNA *may* offer convenience checks *so long as* it complies with section 1748.9 is equivalent to saying that MBNA *may not* offer convenience checks *unless* it complies with section 1748.9. Whether phrased as a conditional permission or as a contingent prohibition, the effect of section 1748.9 is to forbid national banks from offering credit in the form of convenience checks unless they comply with state law. As demonstrated by the instant lawsuit brought under California's unfair competition law (Bus. & Prof. Code, § 17200 et seq.), a national bank may be subject to monetary liability, and its convenience check offers may be enjoined, if it does not comply.

Requiring compliance with section 1748.9 as a condition of "loaning money on personal security" (12 U.S.C. § 24, par. Seventh) through convenience checks "significantly impair[s] the exercise of authority" granted to national banks by the NBA (*Watters*, *supra*, 550 U.S. at p. 12). Section 1748.9 prescribes the *content* of the

11

disclosures by specifying what must be disclosed on each convenience check. Section 1748.9 prescribes specific *language* that a credit card issuer must use ("use of the attached check or draft will constitute a charge against your credit account"). (§ 1748.9, subd. (a)(1).) In addition, section 1748.9 prescribes the *manner* and *format* of the disclosures: the disclosures must appear "on the front of an attachment," the attachment must be "affixed by perforation or other means to the preprinted check," and the disclosures must appear "in clear and conspicuous language." These requirements as to the content, language, manner, and format of disclosures seem no less prescriptive than the New York law in *Franklin* that prohibited banks other than the state's own chartered savings institutions from using the word "saving" or "savings" in their advertisements or business. (See *Franklin*, *supra*, 347 U.S. at p. 374 fn. 1, citing N.Y. stat.) The New York law did not bar national banks from receiving deposits or soliciting deposits through advertisements. It simply required national banks operating in New York to use other words to entice people to deposit their money for safe-keeping and to describe the business of protecting, growing, and lending those deposits. (See *Franklin*, at p. 378 ["[The state] does not object to national banks taking savings deposits or even to their advertising that fact so long as they do not use the word 'savings.' "].) Nevertheless, the high court held that the state law impermissibly interfered with the federally authorized business of national banks. (See *id.* at pp. 377-378.)

Moreover, even if California's disclosure requirements by themselves do not seem particularly onerous, the high court in *Watters* made clear that our preemption analysis must consider the burden of disclosure "regimes imposed not just by [California], but by all States in which the banks operate." (*Watters*, *supra*, 550 U.S. at p. 13.) If disclosure requirements such as those in section 1748.9 were allowed to stand, national banks operating in multiple states would face the prospect of " 'limitations and restrictions as various and as numerous as the States.' [Citation.]" (*Id.* at p. 14.) National banks would have to monitor requirements as to the content, language, manner, and format of

12

disclosures for each of the 50 states (and possibly municipalities as well), and continually adjust their convenience check offers to comply with the prescriptions of each local jurisdiction. Such "[d]iverse and duplicative [regulation] of national banks' engagement in the business of banking . . . is precisely what the NBA was designed to prevent." (*Id.* at pp. 13-14.) Congress intended national banks to have broad power to engage in the "business of banking" by "loaning money on personal security" (12 U.S.C. § 24, par. Seventh), and that power would be significantly impaired if national banks had to comply with a diverse or duplicative patchwork of local disclosure requirements.

## C.

Plaintiff contends that the phrase "subject to law" in the federal banking statute means that Congress intended state laws like section 1748.9 to apply to national banks. (See 12 U.S.C. § 24, par. Seventh [authorizing national banks "[t]o exercise by its board of directors or duly authorized officers or agents, *subject to law*, all such incidental powers as shall be necessary to carry on the business of banking" (italics added)].) But plaintiff's reading of the phrase "subject to law" cannot be squared with the consistent line of high court precedent broadly construing the preemptive force of the NBA absent express language that makes a federal banking power subject to state law. (See *ante*, at pp. 6-7.) Plaintiff's textual argument contravenes the high court's "history . . . of interpreting grants of both enumerated and incidental 'powers' to national banks as grants of authority not normally limited by, but rather ordinarily pre-empting, contrary state law." (*Barnett Bank*, *supra*, 517 U.S. at p. 32.)

Plaintiff further contends that section 1748.9 is a state law of "general application," akin to state contract law, from which national banks are not exempt unless federal law expressly provides. (See *Watters*, *supra*, 550 U.S. at p. 11.) But section 1748.9 is quite different from the kind of state contract law we have previously upheld against preemption challenge. In *Perdue v. Crocker National Bank* (1985) 38 Cal.3d 913, 932-944 (*Perdue*), we examined whether federal banking laws preempted California

13

law prohibiting unreasonable charges or unconscionable contracts as applied to bank charges on checks drawn against insufficient funds. In finding no preemption, we said that "Congress clearly anticipated that banks would be able to charge fees for depositor services sufficient to recover the cost of such services." (*Id.* at pp. 942-943.) The state laws at issue were consistent with Congress's intent, we explained, because they "permit the bank to charge fees sufficient to recover the cost of the services and a reasonable profit." (*Id.* at p. 943.) Importantly, we observed that the state laws "are part of the common law governing all commercial transactions; they regulate not only sale of bank services but the sale of groceries, automobiles, furniture or medical services." (*Ibid.*) We found no indication that Congress sought to authorize banks to charge more for depositor services than what they could charge in a "free and competitive market" with state law doctrines against unreasonable charges or unconscionable contracts comprising part of the background law "applicable to all . . . commercial operations." (*Ibid.*) *Perdue* is consistent with other banking cases that have rejected preemption arguments on the ground that the state laws at issue were laws of general applicability. (See *McClellan v. Chipman* (1896) 164 U.S. 347, 358 ["No function of such banks is destroyed or hampered by allowing the banks to exercise the power to take real estate, provided only they do so under the same conditions and restrictions to which all the other citizens of the state are subjected . . . ."]; *National Bank v. Commonwealth* (1870) 76 U.S. (9 Wall.) 353, 362 [contracts made by national banks "are governed and construed by State laws"].)

Section 1748.9 is not a generally applicable law similar to California's law against unconscionable contracts. It is a law specifically directed at "credit card issuer[s]" and at offers of "credit to a cardholder through the use of a preprinted check or draft." (*Ibid.*) Section 1748.9 does not state a background legal principle against fraudulent, deceptive, or unconscionable practices. It prescribes specific and affirmative conduct that credit card issuers must undertake if they wish to lend money through convenience checks. Unlike the state law considered in *Perdue*, the disclosure requirements of section 1748.9

14

cannot be understood as part of the general legal backdrop to Congress's enactment of federal banking legislation.

To be sure, section 1748.9 is a generally applicable law in the sense that it applies equally to all credit card issuers and does not discriminate against national banks. That distinguishes section 1748.9 from the New York law at issue in *Franklin*, for example, which directed its prohibition on use of the word "savings" at non-state-chartered banks. (See *Franklin*, *supra*, 347 U.S. at p. 374 and fn. 1.) However, *Franklin*'s preemption analysis did not emphasize or even mention the discriminatory aspect of the state law; the high court simply observed that the state law unduly limited the incidental power of national banks to advertise. (*Id.* at pp. 377-378.) Similarly, although the Florida law in *Barnett Bank* allowed only small town banks unaffiliated with a holding company to sell insurance in small towns, the high court indicated that its holding would be the same even if the state law had prohibited all banks from selling insurance in small towns. (*Barnett Bank*, *supra*, 517 U.S. at p. 37 ["[T]he Federal Statute means to grant small town national banks authority to sell insurance, whether or not a State grants its own state banks or national banks similar approval."].)

Moreover, as *Fidelity Federal Savings & Loan Association v. de la Cuesta* (1982) 458 U.S. 141 (*de la Cuesta*) shows, state laws that restrict federally authorized banking powers may be preempted even if they are nondiscriminatory. In *de la Cuesta*, the high court examined federal and state law governing the exercise of a due-on-sale clause, "a contractual provision that permits the lender to declare the entire balance of a loan immediately due and payable if the property securing the loan is sold or otherwise transferred." (*Id.* at p. 145.) Under California law, exercise of a due-on-sale clause violates the state prohibition of unreasonable restraints on alienation " 'unless the lender can demonstrate that enforcement is reasonably necessary to protect against impairment to its security or the risk of default.' " (*Id.* at p. 149, quoting *Wellenkamp v. Bank of America* (1978) 21 Cal.3d 943, 953.) The California rule applied to all lenders, not just

15

to national banks. Yet the high court held that it was preempted by a federal regulation authorizing a federal savings and loan association " 'at its option' " to exercise a due-on-sale clause. (*Id.* at p. 147, quoting federal regulation.) Although the federal regulation did not compel savings and loan associations to use or enforce due-on-sale clauses, it was enough that the California rule "deprived the lender of the 'flexibility' given it by the [federal regulation]." (*Id.* at p. 155.) Similarly here, section 1748.9 restricts the broad permission that federal law gives to national banks to engage in the "business of banking" by "loaning money on personal security." (12 U.S.C. § 24, par. Seventh.) The impairment of a national bank's exercise of its federally authorized power is not lessened by the fact that section 1748.9 applies to all credit card issuers, not just national banks. (See *Watters*, *supra*, 550 U.S. at p. 11 ["Federally chartered banks are subject to state laws of general application in their daily business *to the extent such laws do not conflict with the letter or the general purposes of the NBA*." (Italics added.)].)

To conclude that section 1748.9 is preempted does not mean that all state laws that specifically regulate banking activities are preempted. For example, in *Anderson National Bank v. Luckett* (1944) 321 U.S. 233, the high court held that national banking laws did not preempt a Kentucky statute authorizing the state to take custody of abandoned bank deposits. In addition to noting that the state law applied to "state and national banks alike" (*id.* at p. 247), the court explained: "Under the statute the state merely acquires the right to demand payment of the accounts in the place of the depositors. Upon payment of the deposits to the state, the bank's obligation is discharged. Something more than this is required to render the statute obnoxious to the federal banking laws. For an inseparable incident of a national bank's privilege of receiving deposits is its obligation to pay them to the persons entitled to demand payment according to the law of the state where it does business. A demand for payment of an account by one entitled to make the demand does not infringe or interfere with any authorized function of the bank." (*Id.* at pp. 248-249.) In other words, the Kentucky law

16

authorized "a change in the dominion over [abandoned] accounts . . . , to which the bank must respond by payment of them on lawful demand.  But this . . . is nothing more than performance of a duty by the bank imposed by the federal banking laws, and not a denial of its privileges as a federal instrumentality."  (*Id.* at p. 252.)  Moreover, because of procedures ensuring that "[e]scheat or forfeiture to the state" occurred "only on proof of abandonment in fact," the state law could not be said to "deter [depositors] from placing their funds in national banks in that state."  (*Ibid.*)

The Kentucky statute in *Anderson National Bank v. Luckett* is an example of a state banking law that does not significantly impair the exercise of a national bank's federally authorized power.  As the high court explained, the state law transferred ownership of abandoned accounts without affecting a national bank's prerogative to receive deposits or its obligation to pay upon lawful demand.  The state law did not annul, condition, restrict, hamper, or otherwise limit the powers of a national bank.  The same cannot be said of section 1748.9.  Because section 1748.9 " ' "stands as an obstacle to the accomplishment and execution of the full purposes and objectives" ' " of the NBA, it is preempted.  (*Viva! International*, *supra*, 41 Cal.4th at p. 936.)

**D.**

Concluding that "[s]ection 1748.9 does not, on its face, significantly impair federally authorized powers under the NBA," the Court of Appeal held that "national banks claiming preemption must make a factual showing that the disclosure requirement significantly impairs the exercise of the relevant power or powers."  After stating this requirement of factual proof, the Court of Appeal said "[w]e need not elucidate a precise 'yardstick for measuring when a state law "significantly interferes with" . . . the exercise of national banks' powers.' [Citation.]"  We believe the Court of Appeal's approach is unsupported by preemption case law and unworkable in practice.

17

In *Franklin*, *supra*, 347 U.S. 373, the court did not examine record evidence before concluding that the state prohibition on using the word "savings" significantly impaired the ability of national banks to advertise. And in *Watters*, *supra*, 550 U.S. 1, the court did not undertake an evidentiary inquiry before concluding that the state registration and supervision regime significantly impaired the real estate lending powers of national banks and their operating subsidiaries. (See *Watters*, 550 U.S. at p. 35 (dis. opn. of Stevens, J.) ["There is no evidence . . . that compliance with the Michigan statutes imposed any special burdens on Wachovia Mortgage's activities . . . ."].) The Court of Appeal cited our decision in *Perdue*, where we held on the pleadings that the state law survived preemption and then said that "*conceivably* information not contained in the pleadings *might* lead to a different conclusion." (*Perdue*, *supra*, 38 Cal.3d at p. 943, italics added; see *id.* at pp. 943-944 ["We cannot presume, without evidence, that prohibiting a national bank from setting unreasonable prices or enforcing an unconscionable contract will render that bank less efficient, less competitive or less able to fulfill its function in a national banking system."].) But *Perdue*'s speculative statement was dicta, and we know of no case decided by our court or by the United States Supreme Court in which the issue of preemption turned on whether a national bank made an adequate factual showing that state law significantly impaired its federally authorized powers.

That the Court of Appeal declined to "elucidate a precise 'yardstick for measuring' " significant impairment suggests the impracticality of this approach. As amici curiae American Bankers Association and California Bankers Association explain: "If the yardstick consists of a cost threshold for the specific state law, the law might be preempted as applied to some banks but not others, as banks with more expansive convenience-check activities are able to evidence higher costs. If, in contrast, the yardstick focuses on costs in proportion to the size of the bank, the law might be preempted as to smaller banks but not larger banks. In fact, preemption outcomes might

18

change over time for a specific bank, as it expands its operations. Preemption rulings based on 'factual evidence' for a particular defendant bank therefore will have little value — even for a single bank — much less for many or all national banks.

"Additionally, the new evidentiary requirement will make it very difficult for national banks to predict, in advance, with which state laws they must comply. Even where one national bank has litigated the applicability of the precise state law at issue, other national banks will not be able to rely on the outcome of that litigation because the inquiry will vary depending on the particular operations of the bank and the factual showing made. A national bank that believes it has been subjected to a preempted law will be forced to initiate a lawsuit and submit its *own* evidence, to prove significant impairment of its *own* operations. Otherwise, absent such a lawsuit, the bank would have to monitor, analyze, and comply with state laws that may in fact be preempted . . . ." Here, we conclude as a matter of law that the NBA preempts the disclosure requirements in section 1748.9.

Because we find section 1748.9 preempted by the NBA, we express no view on whether section 1748.9 is also preempted by former regulation 7.4008(d).

### CONCLUSION

The judgment of the Court of Appeal is reversed and the matter remanded for further proceedings.


LIU, J.

WE CONCUR:   CANTIL-SAKAUYE, C. J.
                    KENNARD, J.
                    BAXTER, J.
                    WERDEGAR, J.
                    CORRIGAN, J.
                    GOMES, J.[*]

---

[*] Associate Justice, Court of Appeal, Fifth Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

20

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** Parks v, MBNA America Bank, N.A.

_____

**Unpublished Opinion**
**Original Appeal**
**Original Proceeding**
**Review Granted** XXX 184 Cal.App.4th 652
**Rehearing Granted**

_____

**Opinion No.** S183703
**Date Filed:** June 21, 2012

_____

**Court:** Superior
**County:** Orange
**Judge:** Gail Andrea Andler

_____

**Counsel:**

Rosner & Mansfield, Law Office of Michael R. Vachon and Michael R. Vachon for Plaintiff and Appellant.

Arbogast & Berns, David M. Arbogast; Spiro Moss and J. Mark Moore for Consumer Attorneys of California as Amicus Curiae on behalf of Plaintiff and Appellant.

Edmund G. Brown, Jr., and Kamala D. Harris, Attorneys General, Manuel M. Medeiros, State Solicitor General, Frances T. Grunder, Assistant Attorney General, Kathrin Sears and Sheldon H. Jaffe, Deputy Attorneys General, for People of the State of California as Amicus Curiae on behalf of Plaintiff and Appellant.

Arnold & Proctor, Nancy L. Perkins, Laurence J. Hutt, Teri R. Richardson and Christopher S. Tarbell for Defendant and Respondent.

Morrison & Foerster, James R. McGuire, Rita F. Lin and Aaron D. Jones for American Bankers Association and California Bankers Association as Amici Curiae on behalf of Defendant and Respondent.

Sullivan & Cromwell, Bruce E. Clark, H. Rodgin Cohen, Michael M. Wiseman and Achyut J. Phadke for The Clearing House Association L.L.C. as Amicus Curiae on behalf of Defendant and Respondent.

Horace G. Sneed and Douglas B. Jordan for the Office of the Comptroller of the Currency Administrator of National Banks, upon the request of the Court of Appeal.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Michael R. Vachon
Law Office of Michael R. Vachon
17150 Via Del Campo, Suite 302
San Diego, CA  92127
(858) 674-4100

Sheldon H. Jaffe
Deputy Attorney General
455 Golden Gate Avenue, Suite 11000
San Francisco, CA  94102
(415) 703-5389

Laurence J. Hutt
Arnold & Proctor
777 South Figueroa Street, 44th Floor
Los Angeles, CA  90017-5844
(213) 243-4000