Filed 4/27/15

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| JASMINE PHILLIPS, as trustee etc. et al., | B251836 |
| Plaintiffs and Appellants, | (Los Angeles County Super. Ct. No. BC492469) |
| v. | |
| BANK OF AMERICA, | |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of the County of Los Angeles, John Shepard Wiley, Jr., Judge.  Reversed.

Markun Zusman Freniere & Compton, David S. Markun, Daria Dub Carlson, for Plaintiffs and Appellants.

Reed Smith, James C. Martin, Marc A. Lackner, Peter J. Kennedy for Defendant and Respondent.

# INTRODUCTION

We hold that a bank may not for account service fees debit a so-called Coogan Trust Account—a statutorily required account to preserve 15 percent of a minor's gross earnings for artistic or creative services for the benefit of the minor until the minor turns 18 or is emancipated (Fam. Code, § 6750 et seq.) (Coogan Law[1])—because of the statutory ban on withdrawals from a Coogan Trust Account without court approval (§ 6753, subd. (b)).  Such a debit, without court approval, is a prohibited withdrawal under the applicable state statute, and that state law prohibition on a debit by a national bank is not preempted by federal law.  We therefore reverse the judgment entered on a demurrer sustained without leave to amend.

# FACTUAL AND PROCEDURAL BACKGROUND

Plaintiffs and appellants Jasmine Phillips aka Jasmine Gonzales (Phillips), as trustee for Alex Gonzales, and Anesha L. Colemen, as trustee for Jadon I. Monroe, filed a class action lawsuit on behalf of themselves and all others similarly situated against defendant and respondent Bank of America, N.A., a national bank association.  Plaintiffs in their operative first amended complaint (FAC) alleged causes of action for breach of written contract, breach of the implied covenant of good faith and fair dealing, conversion, and unlawful and unfair business practices.  Plaintiffs alleged that they were "the parents or guardians of unemancipated minors who have been paid for performing artistic or creative services."

Plaintiffs alleged that, as trustees for their minor children, they "opened accounts entitled 'Coogan Trust' Accounts for the[] minors at [defendant] in full compliance

---

[1]    All statutory citations are to the Family Code unless otherwise noted.  We use the section and subdivision numbers of the Coogan Law following the last amendment in 2013, which amendment did not change the wording relevant here or the section numbers, but only renumbered subsections and subdivisions.

2

with . . . [section] 6750 et seq. [the Coogan Law]. From time to time, wages or other monies earned by the minors for performing artistic services were deposited into Plaintiffs' Coogan Trust Accounts for the benefit of the minors. . . . [¶] During the four years preceding the filing of the initial Complaint in this action, defendant[] ha[s] made withdrawals from Plaintiffs' Cogan Trust Accounts, including but not limited to withdrawals for monthly service fees, without court approval."

In their causes of action for breach of contract and breach of the covenant of good faith and fair dealing, plaintiffs alleged that they entered into written agreements[2] with defendant "pursuant to which defendant[] agreed to open and maintain . . . Coogan Trust Account[s] . . . . [¶] Notwithstanding these written agreements . . . defendant[] regularly and systematically breached [these agreements] by making withdrawals from [the] Coogan Trust Accounts, including but not limited to monthly service charges, without court approval."

In plaintiffs' cause of action for conversion, they alleged that "[d]espite defendant['s] representations that defendant[] would open and maintain the subject accounts as Coogan Trust Accounts, defendant[] unlawfully took and converted monies from the Coogan Trust Accounts for defendant['s] own use." In their cause of action for unlawful and unfair business practices under the Unfair Competition Law (Bus. & Prof. Code, § 17200 et seq.), plaintiffs alleged that "[n]otwithstanding applicable California Family Code sections as well as other provisions of California law, defendant[] regularly and systematically made withdrawals from the Coogan Trust Accounts . . . , including but not limited to 'monthly service charges.' [¶] In addition, defendant[] represented . . . that defendant[] would open and maintain the subject accounts as Coogan Trust Accounts. Despite these representations, defendant[] failed to maintain the accounts as Coogan Trust Accounts and instead regularly and systematically made withdrawals from these accounts, including but not limited to 'monthly service charges.'" Plaintiffs sought as relief compensatory damages, issuance of a temporary restraining order and a preliminary

---

[2] Copies of the written contracts were not attached to the FAC.

and permanent injunction, disgorgement of all profits resulting, punitive damages, costs of suit, attorney fees, and such other and further relief as the trial court might deem just and proper.

The trial court sustained defendant's demurrer to the FAC without leave to amend, finding that the term "withdrawal" as used in the Coogan Law did not include the debiting of an account by a financial institution for service charges. The trial court thereafter entered a final judgment of dismissal, and plaintiffs filed a timely notice of appeal.

The parties have confirmed that the issue on appeal is whether the Coogan Law precludes defendant from debiting the Coogan Trust Accounts for account service fees, including whether the debits by defendant are withdrawals under the Coogan Law and if so whether the state law that has the effect of banning such debits by a national bank is preempted by federal law. The parties agree that whether plaintiffs have alleged facts sufficient to state the specific causes of action asserted in the FAC is not an issue in this appeal.

**DISCUSSION**

### A.    Standard of Review and Rules of Interpretation

We review de novo a judgment based on an order sustaining a demurrer. (*Committee for Green Foothills v. Santa Clara County Bd. of Supervisors* (2010) 48 Cal.4th 32, 42; *Siliga v. Mortgage Electronic Registration Systems, Inc.* (2013) 219 Cal.App.4th 75, 81.) "As the Supreme Court has observed, 'In reviewing the sufficiency of a complaint against a general demurrer, we are guided by long-settled rules. "We treat the demurrer as admitting all material facts properly pleaded, but not contentions, deductions or conclusions of fact or law. [Citation.] We also consider matters which may be judicially noticed." [Citation.] Further, we give the complaint a reasonable interpretation, reading it as a whole and its parts in their context. [Citation.] When a demurrer is sustained, we determine whether the complaint states facts sufficient to

4

constitute a cause of action. [Citation.] And when it is sustained without leave to amend, we decide whether there is a reasonable possibility that the defect can be cured by amendment: if it can be, the trial court has abused its discretion and we reverse; if not, there has been no abuse of discretion and we affirm. [Citations.] The burden of proving such reasonable possibility is squarely on the plaintiff. [Citation.]' [Citation.]" (*Los Angeles Memorial Coliseum Com. v. Insomniac, Inc.* (2015) 233 Cal.App.4th 803, 819.) In addition, "Whether a law is preempted is an issue of law, reviewed de novo. (*Farm Raised Salmon Cases* (2008) 42 Cal.4th 1077, 1089, fn. 10 [72 Cal.Rptr.3d 112, 175 P.3d 1170] ['federal preemption presents a pure question of law'] . . . .)" (*Zubarau v. City of Palmdale* (2011) 192 Cal.App.4th 289, 305.)

The California Supreme Court stated the rules of statutory interpretation as follows: "Our fundamental task . . . is to determine the Legislature's intent so as to effectuate the law's purpose. We first examine the statutory language, giving it a plain and commonsense meaning. We do not examine that language in isolation, but in the context of the statutory framework as a whole in order to determine its scope and purpose and to harmonize the various parts of the enactment. If the language is clear, courts must generally follow its plain meaning unless a literal interpretation would result in absurd consequences the Legislature did not intend. If the statutory language permits more than one reasonable interpretation, courts may consider other aids, such as the statute's purpose, legislative history, and public policy. [Citations.]" (*Coalition of Concerned Communities, Inc. v. City of Los Angeles* (2004) 34 Cal.4th 733, 737.) The California Supreme Court also has said "'we consider portions of a statute in the context of the entire statute and the statutory scheme of which it is a part, giving significance to every word, phrase, sentence, and part of an act in pursuance of the legislative purpose.' [Citation.]" (*Sierra Club v. Superior Court* (2013) 57 Cal.4th 157, 166.)

## B.    Applicable Law

The history of the Coogan Law has been summarized in Legislative documents. "The Coogan Law was enacted [as former Civil Code sections 36.1 and 36.2] in 1938 in

response to the childhood star Jackie Coogan's plight.  Even though he earned millions as a child, Coogan was surprised to find out when he reached adulthood that he was flat broke, because his mother and stepfather spent all his money—legally. . . .  Thus, the Coogan Law was passed in order to preserve a portion of the minor's earnings for the minor's use when he or she reaches the age of majority."  (Sen. Rules Com., Off. of Sen. Floor Analyses, Analysis of Sen. Bill No. 1162 (1999-2000 Reg. Sess.) as amended Aug. 18, 1999, pp. 6-7.)  Inadequacies in the statutory scheme, however, resulted in additional abuses of the finances of such child-actors as Shirley Temple, Macauly Culkin, Lee Aaker, and Gary Coleman—whose parents left the minors with at best only a small percentage of what they earned during their careers.  (Sen. Floor, 3d reading of Sen. Bill No. 1162 (1999-2000 Reg. Sess.) as amended Aug. 18, 1999, p. 3.)  The Legislature amended the Coogan Law in 1999, 2003, and 2013.  (Stats 1999, ch 940, §§ 2, 3, 5 (SB 1162); Stats 2003, ch 667, §§ 1-3 (SB 210); Stats 2013, ch 102, § 1 (AB 533); see generally Din, *Chapter 667:  Instituting Proper Trust Funds and Safeguarding the Earnings of Child Performers from Dissipation by Parents, Guardians and Trustees* (2004) 35 McGeorge L.Rev. 473.**)**

As relevant to this case, the Coogan Law[3] provides that for a contract pursuant to which a minor is employed or agrees to render artistic or creative services, the minor's employer must set aside 15 percent "of the minor's gross earnings pursuant to the contract" in trust "in an account or other savings plan, and preserved for the benefit of the minor."  (§ 6752, subds. (a), (b)(1), (b)(4).)  At least one of the minor's parents or legal guardians must "be appointed as trustee of the funds," unless the superior court determines that the appointment "of a different individual, individuals, entity, or entities" is required in the best interests of the minor.  (§ 6752, subds. (b)(2), (c)(1).)

---

**3**    Because plaintiffs alleged in the FAC that defendant made withdrawals from the Coogan Trust Accounts during the four years preceding the filing of the initial complaint in this action, we refer to the Coogan Law in effect from four years preceding the filing of the complaint to the date of the filing of that complaint—September 20, 2012—except, as noted, we use the numbers of the subsections and subdivisions as they presently exist because the wording, as relevant here, was not changed by the 2013 amendment.

6

The Coogan Law provides that within seven business days after execution of the contract, the trustee must establish a trust account, "known as a Coogan Trust Account," at a "bank, savings and loan institution, credit union, brokerage firm, or company registered under the Investment Company Act of 1940, that is located in the State of California." (§ 6753, subds. (a), (d).) Within 10 business days after commencement of employment, the trustee must "provide the minor's employer with a true and accurate photocopy of the trustee's statement pursuant to Section 6753." (§§ 6752, subds. (b)(3), (c)(2), 6753, subd. (c).) The trustee must also include identifying information of the financial institution and account, and any "additional information needed by the minor's employer to deposit" the set-aside funds into the account. (§§ 6752, subds. (b)(3), 6753, subd. (c).) The trustee must also attach to the statement a copy "of any information received from the financial institution confirming the creation of the account." (§ 6753, subd. (c).) Within 15 business days after receiving, inter alia, the trustee's statement, the minor's employer must deposit into the Coogan Trust Account "15 percent of the minor's gross earnings pursuant to the contract." (§ 6752, subds. (b)(4), (c)(3).) The parent or guardian "acting in his or her fiduciary relationship, shall, with the earnings and accumulations of the minor under the contract, pay all liabilities incurred by the minor under the contract, including, but not limited to, payments for taxes on all earnings, including taxes on the amounts set aside under subdivisions (b) and (c) of this section . . . ." (§ 6752, subd. (d).) As 15 percent of the *gross* earnings is deposited in the Coogan Trust Account, it follows that these liabilities would be payable out of the remaining 85 percent of the earnings.

The Coogan Law also specifies that "upon petition of the parent or legal guardian, the minor . . . or the trustee or trustees, on good cause shown," the superior court may "order the trust be amended or terminated." (§ 6752, subds. (b)(7), (c)(5).) Until the minor becomes 18 years old, or a declaration of emancipation of the minor is issued, "no withdrawal by the beneficiary or any other individual, individuals, entity, or entities may be made of funds on deposit in trust without written order of the superior court . . . ." (§

7

6753, subd. (b).)  It is the Coogan Law and specifically section 6753, subdivision (b), that are at issue in this appeal.

### C.  Analysis

Plaintiffs assert that defendant, without written orders of the superior court, debited Coogan Trust Accounts for account service fees, thereby violating the prohibition against withdrawals from Coogan Trust Accounts.  Defendant contends that such debits are not withdrawals and that even if they were, any state law that prohibits such debits is preempted by federal law, which permits the imposition of account service fees and precludes the application of state law that prevents or significantly interferes with a national bank's exercise of its powers.

### 1.  *Debiting the Account as a Withdrawal*

Section 6753, subdivision (b) prohibits the "withdrawal" of funds on deposit in a Coogan Trust Account by the beneficiary "or any other individual, individuals, entity, or entities," without court approval.  Defendant contends that its "debit" of a Coogan Trust Account for account service fees is not a "withdrawal" of funds, and the use of the phrase "any other individual, individuals, entity, or entities" shows that ban on withdrawals is meant only "to reach trustees—a parent or guardian or other individual or entity—who are responsible for managing and controlling a child-actors' earnings."  The parties rely on dictionary definitions of "debit" and "withdrawal" to support their positions.  But, when a bank debits an account, it necessarily withdraws money from that account.  (See Black's Law Dictionary (10th ed. 2014) p. 487, Col. 1 [defines "debit" as "1.  A sum charged as due or owing; esp., a decrease in the amount of money in a bank account, as because one has *withdrawn* money from it."  (Italics added.)[4]

---

[4]  Debiting an account means to create a record of a transaction and does not necessarily require a withdrawal.  (*GWIN, Inc. v. Don Best Sports* (E.D. Tex. 2008) 548 F.Supp.2d 342, 351.)  But here, a bank's debiting of the accounts for its own fee necessarily means to withdraw money from the account and transfer it to the bank.  A

Moreover, courts have used the word "withdrawal" to include a bank's debiting an account for, or charging, a service fee or charge. Thus, in *Arlington Video Productions, Inc. v. Fifth Third Bancorp* (6th Cir. 2014) 569 Fed.Appx. 379, the court said, "The parties agreed in their contract that the Bank could collect service charges, with Arlington giving the Bank a security interest in its business checking account to permit the Bank to *withdraw* any debt Arlington owed to the Bank." (*Id.* at p. 386, italics added.) The court added, "The Bank did not disclose to Arlington all of the facts relating to the deposit adjustment fee or the increase in the returned item fee before automatically *withdrawing* those fees from Arlington's account and listing unexplained 'service charges' on the monthly bank statements." (*Id.* at p. 389, italics added; see *In re Moffitt, Zwerling & Kemler, P.C.* (E.D. Va. 1995) 875 F.Supp. 1152, 1168 ["Second, $15 was *withdrawn* automatically by the bank from the Law Firm's account as a service charge to maintain the account of Zwerling's predecessor firm" (italics added)], *aff'd in part, vacated in part on other grounds, U.S. v. Moffitt, Zwerling & Kemler, P.C.* (4th Cir. 1996) 83 F.3d 660; *H.G. Whittenberg, Sr. v. Commissioner of Internal Revenue* (1944 Tax Ct.) 1944 WL 7224 ["Other *withdrawals* were for bank service charges and bank tax" (italics added)]; *In re 604 Columbus Avenue Realty Trust v. Capitol Bank and Trust Company* (Bkrtcy D. Mass. 1990) 119 B.R. 350, 361-362 ["the Bank automatically *withdrew* and paid to itself $21.75 (in three *withdrawals* of $7.25 on July 31, August 29, and September 30, 1986) for service charges . . . . [¶] . . . [¶] [Appendix A] identifies the deposits, the checks written and processed against the account, and the automatic *withdrawals* for interest, tax escrow, and service charges" (italics added)], *aff'd in part, vacated in part on other grounds, In re 604 Columbus Ave. Realty Trust* (1st Cir. 1992) 968 F.2d 1332.)

The purpose of the Coogan Trust Account is for the "preserving for the benefit of the minor [15 percent] of the minor's *gross* earnings" until the minor reaches majority.

---

"debit card" is used to withdraw or transfer monies from an account. (See *In re Visa Check/MasterMoney Antitrust Litigation* (E.D. N.Y. 2000) 192 F.R.D. 68, 72, *aff'd In re Visa Check/MasterMoney Antitrust Litigation* (2d Cir. 2001) 280 F.3d 124, superseded by statute on other grounds as stated in *Attenborough v. Const. and General Bldg. Laborer's* (S.D. N.Y 2006) 238 F.R.D. 82, 100.)

(§ 6753, subd. (a), italics added.)  Preserving the gross amount of earnings contemplates no deductions for taxes or fees of any kind without court approval.

Defendant reads the statute to mean that its prohibition on withdrawals applies only to the minor and his or her parents, guardians, and trustees and not to others, such as banks.  Under this reading, as defendant concedes, others could execute on the amounts in the Coogan Trust Account or otherwise lawfully obtain portions of what is supposed to be protected monies, which actions are inconsistent with the purpose of a Coogan Trust Account.  (See Prob. Code, §§ 15300, 15301 [if the trust instrument provides that a beneficiary's interest in the trust funds is not subject to transfer, the beneficiary's interest in those funds is not subject to enforcement of a money judgment until paid to the beneficiary].)

Section 6753, subdivision (b) specifies that prior to the time the minor becomes 18 years old or is emancipated, "no withdrawal by the beneficiary or *any other individual, individuals, entity, or entities* may be made of funds on deposit in trust without written order of the superior court."  (Italics added.)  Thus, the statute explicitly provides that the withdrawal prohibition is not limited to the beneficiary, parent, or trustee.

Defendant argues that the phrase "any other individual, individuals, entity or entities" is used elsewhere in the statute as referring to the responsibilities of account trustees (§ 6752, subds. (b)(2), (b)(6), (c)(1), (c)(4); § 6753, subd. (d)) and should therefore be so limited in the provision in question.  But in each of the instances referred to by defendant, the individual or entity refers specifically to a parent or trustee.  In the phrase at issue here, the words "trustee" or "parent" are not used and there is no language limiting the scope of the words "any other individual, individuals, entity, or entities" to parents or trustees.

Also, in three of defendant's examples, the phrase "individual, individuals, entity or entities" refers to a broader group than just those included within the phrase "trustee or trustees."  Defendant refers to section 6752, subdivisions (b)(6) and (c)(4), which subdivisions both provide, "The trustee or trustees of the trust shall be the only individual, individuals, entity, or entities with the obligation or duty to monitor and

10

account for those funds once they have been deposited by the minor's employer." Defendant also cites section 6753, subdivision (d), which provides that "[t]he trustee or trustees of the trust shall be the only individual, individuals, entity, or entities with the obligation or duty to ensure that the funds remain in trust . . . ." In each of these examples, the phrase "individual, individuals, entity or entities" is not limited to "trustee or trustees." The phrase suggests there are individuals and entities that are not trustees under the Coogan Law.

Defendant argues that as only beneficiaries (minors through their guardians), trustees, parents, and guardians can petition for an order amending or terminating the trust (§ 6752, subds. (b)(7), (c)(5)), they are the only ones who can seek an order permitting a withdrawal from the Coogan Trust Account and thus the restriction on withdrawals only applies to them—not to third parties. That those with a fiduciary duty can seek to amend or terminate the trust does not mean that a third party without such a fiduciary duty cannot seek court approval to withdraw funds from the trust or that the restriction on withdrawals does not apply to such third parties.

In addition, defendant cites to Assembly Bill 533, as originally drafted (Assem. Bill No. 533 (2013-2014 Reg. Sess.) as introduced Feb. 20, 2013) (AB 533), as seeking to amend section 6753, subsection (b) to extend "its prohibition on *withdrawals* [without court approval] to [include] 'the financial institution or company in which the trust is held, for purposes of collecting fees or service charges assessed for maintenance of the trust.'"[5] (Italics added.) The Legislature failed to enact that version of AB 533, but its failure to enact proposed legislation has little or no value in determining the legislative intent of a previously enacted statute. (See *Carter v. California Dept. of Veterans Affairs* (2006) 38 Cal.4th 914, 927.) Moreover, we note that in making this argument, defendant essentially concedes that AB 533, as originally drafted, deemed its collection of account

---

[5] The original draft was amended to remove this reference. (Assem. Amend. to Assem. Bill No. 533 (2013-2014 Reg. Sess.) Apr. 18, 2013; Sen. Amend. to Assem. Bill No. 533 (2013-2014 Reg. Sess.) June 3, 2013.)

11

service fees from a Coogan Trust Account to be a "withdrawal." (Assem. Bill No. 533 (2013-2014 Reg. Sess.) as introduced Feb. 20, 2013.)

If a parent, guardian, or trustee does not timely supply the employers with a copy of a trustee's statement establishing the Coogan Trust Account, the minor's employer must forward to the Actor's Fund of America the 15 percent of the minor's gross earnings. (§ 6752, subds. (b)(9)(A), (c)(7)(A).) The Actor's Fund of American then becomes the trustee of such funds. (*Ibid.*) The Legislature specifically provided that the Actor's Fund of America "may assess and deduct from the balance of the beneficiary's account reasonable management, administrative, and investment expenses." (§ 6752, subd. (f)(2).) Thus, when a withdrawal for charges from a minor's trust account is permissible, the Legislature specifically provided for it. No such authorization is given to a depository bank. For all of these reasons, by debiting the Coogan Trust Accounts, defendants have made impermissible withdrawals from those accounts.

### 2. *Preemption*

Plaintiffs alleged that although defendant entered into contracts and otherwise represented "that the subject accounts would be opened and maintained as 'Coogan Trust Accounts,'" it "failed to maintain the accounts as Coogan Trust Accounts and instead . . . made withdrawals from these accounts, including but not limited to 'monthly service charges,' without court approval." Defendant asserts that the application of the Coogan Law (specifically, section 6753, subdivision (b)) to prevent its debits is preempted by federal law. We disagree.

The California Supreme Court in *Parks v. MBNA America Bank, N.A.* (2012) 54 Cal.4th 376 (*Parks*) held that the National Bank Act (NBA), 12 U.S.C. § 1 et seq. preempted a California law requiring certain disclosures that accompany preprinted checks provided by credit card issuers to cardholders for use as credit. In so holding, the court summarized the preemption principles as follows: "A preemption 'question is one of congressional intent. Did Congress, in enacting the Federal Statute, intend to exercise its constitutionally delegated authority to set aside the laws of a State? If so, the

12

Supremacy Clause requires courts to follow federal, not state, law.' (*Barnett Bank* [*of Marion Cty. v. Nelson* (1996)] 517 U.S. [25,] 30 [(*Barnett Bank*), citing U.S. Const., art. VI, cl. 2] . . . . [¶] This court has recognized 'four species of federal preemption: express, conflict, obstacle, and field.' [Citation.] 'First, express preemption arises when Congress "define[s] explicitly the extent to which its enactments pre-empt state law. [Citation.] . . . ." [Citations.] Second, conflict preemption will be found when simultaneous compliance with both state and federal directives is impossible. [Citations.] Third, obstacle preemption arises when "'under the circumstances of [a] particular case, [the challenged state law] stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."' [Citations.] Finally, field preemption, i.e., "Congress' intent to pre-empt all state law in a particular area," applies "where the scheme of federal regulation is sufficiently comprehensive to make reasonable the inference that Congress 'left no room' for supplementary state regulation." [Citation.]' [Citations.]" (*Parks*, *supra*, 54 Cal.4th at pp. 382-383; see also *Oneok, Inc. et al. v. Learjet, Inc. et al.* (April 21, 2015) 575 U.S. __, 2015 U.S. LEXIS 2808, *5-6.) As in *Parks, supra,* 54 Cal.4th 376, the issue here is whether state law "prevent[s] or significantly interfere[s] with the national bank's exercise of its powers." (*Barnett Bank, supra,* 517 U.S. at p. 33; see generally 7A Michie on Banks and Banking (2013) ch. 15, §§ 1-6, pp. 5-93.)

The court in *Parks, supra,* 54 Cal.4th at pages 384-385 added that the United States Supreme Court "observed that a federal grant of power to national banks does not preempt state law where there is 'an explicit statement that the exercise of that power is subject to state law' (*Barnett Bank, supra*, 517 U.S. at p. 34) or where the state law 'does not prevent or significantly interfere with the national bank's exercise of its powers' (*id.* at p. 33). Although 'normally Congress would not want States to forbid, or to impair significantly, the exercise of a power that Congress explicitly granted,' federal banking laws do not preempt state laws that do not significantly impair a national bank's exercise of its congressionally authorized powers. (*Ibid.*) In 2010, the Dodd-Frank Act codified the significant impairment test articulated in *Barnett Bank*. (See 12 U.S.C. §

13

25b(b)(1)(B) [declaring state consumer financial laws preempted if 'in accordance with the legal standard for preemption in the decision of the Supreme Court of the United States in [*Barnett Bank*], the State consumer financial law prevents or significantly interferes with the exercise by the national bank of its powers'].)"[6]

"The term 'State consumer financial law' means a State law that does not directly or indirectly discriminate against national banks and that directly and specifically regulates the manner, content, or terms and conditions of any financial transaction (as may be authorized for national banks to engage in), or any account related thereto, with respect to a consumer." (12 U.S.C. § 25b(a)(2).) The Coogan Law is a "State consumer financial law." It does not discriminate against national banks; it provides that a withdrawal from a Coogan Trust Account may not be made by anyone. (§6753, subd. (b); see 7A Michie on Banks and Banking, *supra,* ch. 15, § 5, at p. 52 ["The application of state law to bank service charges is not preempted by the comprehensive federal statutory scheme which occupies the field"].)

The Dodd-Frank Act specifically provides that the preemption determination under 12 U.S.C. section 25b(b)(1)(B) may be made by a court or by regulation or order of the Office of the Comptroller of the Currency (OCC) on a "case-by-case basis." (12 U.S.C. § 25b(b)(3),(5); see generally Horvath Preemption Analysis Under the National Bank Act: Then and Now (2013) 67 Consumer Fin. L.Q. Rep. 5). The term "case-by-case basis" refers to a determination on preemption made by the OCC based on various factors and after consultation with the Bureau of Consumer Financial Protection. (12 U.S.C. § 25b(b)(3)(A), (B).) The Dodd-Frank Act restricts the ability of the OCC to preempt state consumer financial laws as they apply to banks by providing specific procedural standards to be followed. (12 U.S.C. § 25b(b)(3)(A), (B); see Carpenter, The Dodd-Frank Wall Street Reform and Consumer Protection Act, Title X: The Consumer

---

[6] One authority has stated, "Federal preemption in the consumer protection area is not dead, but it's certainly weaker than it was before the Dodd-Frank Wall Street Reform and Consumer Act." (19-7 Clark and Clark, Clarks' Bank Deposits and Payments Monthly (July 2010), 1, 10.)

Financial Protection Bureau (Congressional Research Service) (July 21, 2010) 14.) A court reviewing determinations by the OCC regarding preemption of state law "shall assess the validity of such determinations, depending upon the thoroughness evident in the consideration of the agency, the validity of the reasoning of the agency, the consistency with other valid determinations made by the agency, and other factors which the court finds persuasive and relevant to its decision." (12 U.S.C. § 25b(b)(5)(A).)

There has been no determination of preemption by the OCC under 12 U.S.C. § 25b(5) of the state law involved here.[7] Thus, we do not have to review any OCC determination under the standards set forth in the Dodd-Frank Act. Instead we determine if preemption is required under *Barnett Bank, supra,* 517 U.S. 25. In holding the state of Florida's law that prevented banks from selling insurance was preempted, the United States Supreme Court in *Barnett, supra,* 517 U.S. at page 33, said that to be preempted by federal law, a state law that affects national banks must "prevent or significantly interfere with the national bank's exercise of its powers."[8]

"Business activities of national banks are controlled by the [NBA], and regulations promulgated thereunder by [the OCC]." (*Watters v. Wachovia Bank, N.A.* (2007) 550 U.S. 1, 6, superseded by statute on other grounds as stated in *Dept. of Revenue v. Pikco Finance, Inc.* (Miss. 2012) 97 So.3d 1203, 1209, fn. 7.) The NBA "vest[s] in nationally chartered banks enumerated powers and 'all such incidental powers as shall be necessary

---

[7] Defendant cites to an OCC Interpretive Letter stating that a bank "is authorized by section 24(Seventh) and 12 C.F.R. section 7.4002 to debit *overdraft fees* from depositors' accounts." (Office of the Comptroller of the Currency, Interpretive Letter No. 1082 (May 17, 2007) 2007 WL 5393636, at p. 1, fn. omitted, italics added.) Overdraft fees, however, are not the equivalent of account service fees.

[8] One authority, in commenting on the application of *Barnett Bank, supra,* 517 U.S. 25 to national banks on the passage of the Dodd-Frank Act said, "Does that mean that the OCC will now be unable to show any 'significant interference' by a state law unless that law flatly prohibits something that a federal statute expressly allows? Or should that term be read more broadly?" (19-7 Clark and Clark, Clarks' Bank Deposits and Payments Monthly, *supra,* at p. 12.)

to carry on the business of banking.' 12 U.S.C. § 24 Seventh." (*Watters v. Wachovia Bank, N.A.*, *supra*, 550 U.S. at p. 11.) The OCC is the agency responsible for regulating national banks. (*Id.* at p. 6; *In re HSBC Bank, USA, N.A., Debit Card Overdraft* (E.D. N.Y. 2014) 1 F.Supp.3d 34, 44.)

"A national bank may receive deposits and engage in any activity incidental to receiving deposits." (12 C.F.R. § 7.4007(a).) National banks are authorized under federal regulations to "charge [their] customers non-interest charges and fees, including deposit account service charges."[9] (12 C.F.R. § 7.4002(a).) Notwithstanding its broad language, 12 C.F.R. section 7.4002(a) specifically provides, "The OCC applies preemption principles derived from the United States Constitution, as interpreted through judicial precedent, when determining whether State laws apply that purport to limit or prohibit charges and fees described in this section." (12 C.F.R. § 7.4002(d).) Thus, under 12 C.F.R. section 7.4002(d), preemption concerning fees and charges is to be determined not by the regulation itself but by general preemption principles established by judicial precedent.[10]

Moreover, the regulation authorizing account service charges does not purport to preempt any state restriction on the method of obtaining bank fees for accounts such as Coogan Trust Accounts. National banks are authorized to "charge" their customers non-interest fees, including deposit account service charges. (12 C.F.R. § 7.4002(a).) The

---

[9]    "State laws purporting to regulate national bank fees and charges are addressed in 12 C.F.R. section 7.4002." (12 C.F.R. § 7.4007(b), n. 4.)

[10]    An authority has written that "federal preemption has become a major factor in courts' upholding a wide variety of deposit-side service fees, as well as closely related products and procedures. In many of these situations, the most important tool is 12 C.F.R. section 7.4002." (1 Clark and Clark, The Law of Bank Deposits, Collections and Credit Cards (3d ed. 2014) § 3.01[4][i], p. 3-98.) The examples of preemption included ATM surcharges, check-cashing fees, credit card interest rates and fees, overdraft fees as interest, high-to-low check posting, and setting off against social security direct deposits. (*Id.* at pp. 3-98 to 3-99; see *Gutierrez v. Wells Fargo Bank* (9th Cir. 2012) 704 F.3d 712 [preemption of Unfair Competition Law application to order of posting but not as to fraudulent or misleading practices as to posting methods].)

OCC regulation (12 C.F.R. § 7.4002(a)) does not provide that the account service fees must be taken from a trust account or any specific account. The regulation merely provides that a bank is authorized to "charge" for the fees.

Plaintiffs' claims are premised on the theory that withdrawing account service fees from the Coogan Trust Accounts without court approval is inconsistent with the accounts being Coogan Trust Accounts. Plaintiffs do not challenge defendant's right to "charge" the fee. The account service fees may be charged to the parent or guardian, at least one of whom must be the trustee (§ 6752, subds. (b)(1), (b)(2)), and may be paid from the non-trust fund assets that are the source from which all other liabilities incurred by the minors under the employment contracts, including taxes, are paid. (§ 6752, subd. (d).) If a trustee prefers that the fee be taken out of the Coogan Trust Account, or defendant federal bank desires to debit the Coogan Trust Account, either may seek court approval for such a withdrawal. (§ 6753, subd. (b)).

As noted, by contrast, in the case of the Actors' Fund of America acting as trustee for the funds because the trustee failed to provide timely the minor's employer with a copy of the trustee's statement pursuant to section 6753 (§ 6752, subds. (b)(9)(A), (c)(7)(A)), the State Legislature specifically stated that the Actors' Fund of America "may assess and deduct from the balance of the beneficiary's account reasonable management, administrative, and investment expenses . . . ." (§ 6752, subd. (f)(2).) Here, the Coogan Law's restriction on withdrawals does not "prevent or significantly interfere with" the exercise by a national bank of its power. Accordingly, section 6753, subdivision (b) is not preempted by federal law.

## DISPOSITION

The judgment is reversed. Plaintiffs are awarded their costs on appeal.

**CERTIFIED FOR PUBLICATION**


MOSK, J.


We concur:


TURNER, P. J.


GOODMAN, J.[*]


---

[*] Judge of the Superior Court of the County of Los Angeles, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.